1  ALEXANDER E. WOLF (SBN 299775)
2  **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
3  awolf@milberg.com
   280 South Beverly Drive, Penthouse
4  Beverly Hills, California 90212
   Tel: 872-365-7060

5  Attorneys for Plaintiffs

6

7

8

9  ## UNITED STATES DISTRICT COURT

10  ## CENTRAL DISTRICT OF CALIFORNIA

11  | ERIC DOYLE and GABRIEL | Case No. |
12  | CONTRERAS, individually and on behalf |
13  | of all similarly situated persons, | **CLASS ACTION COMPLAINT** |
14  | Plaintiff, | JURY TRIAL DEMANDED |
15  | v. |
16  | FKA DISTRIBUTING CO., LLC d/b/a |
17  | HOMEDICS LLC, a Michigan limited |
18  | liability company, and WALMART INC., |
    | a Delaware corporation, |
19  |  |
20  | Defendants. |
21
22
23
24
25
26
27
28

Plaintiffs Eric Doyle and Gabriel Contreras (collectively, "Plaintiffs") on behalf of themselves and all others similarly situated, bring this class action against Defendant FKA Distributing Co., LLC d/b/a HoMedics LLC ("HoMedics") and Defendant Walmart Inc. ("Walmart") (collectively, "Defendants"), and allege on personal knowledge as to themselves, and investigation of counsel and information and belief, as follows:

# I.   NATURE OF THE ACTION

1.     This class action lawsuit concerns a fraud perpetrated on thousands of purchasers of Equate Upper Arm Blood Pressure Monitors (the "Product" or "Products") for personal use and not for resale. The Products are comprised of the Equate 8000 Series Upper Arm Blood Pressure Monitor, Equate 8500 Series Upper Arm Blood Pressure Monitor, Equate 4000 Series Upper Arm Blood Pressure Monitor, and the Equate 6000 Series Upper Arm Blood Pressure Monitor.[1]

2.     The Products are marketed by Defendants as in-home medical devices capable of providing consistently accurate and reliable blood pressure readings for all users, while in truth, they are incapable.  The blood pressure readings generated by the Products are consistently and wildly inaccurate for thousands of users.  For example, one reviewer went to the emergency room based on an inaccurate reading.  She then retested the Product while at the hospital and received a reading 25 mmHg (millimeters of mercury) higher than her actual blood pressure level.  Another reviewer who brought the Product to a doctor's appointment said the Product's readings were 47 mmHg higher than the doctor's machine and manual readings.  And many other Class members have experienced similarly inaccurate and inconsistent readings.

3.     Of note, Northwestern researchers conducted a scientific study to validate the accuracy of the Products.[2]  That study concluded that the Products were only accurate

---

[1] The Products also include any other equivalent model variants for the Equate Upper Arm Blood Pressure Monitors (i.e., same blood pressure algorithm and inflation mechanism or method).

[2] Peprah, Lee, and Persell, Journal of Human Hypertension, *Validation testing of five home blood pressure monitoring devices for the upper arm according to the ISO 81060-2:2018/AMD 1:2020 protocol* (submitted June 8, 2022 and published January 18, 2023) (hereinafter the "Northwestern Study").

within a range of **+/- 5.1 mmHg** (with a **6.41 mmHG standard deviation**) for diastolic pressure—meaning that for many users, the Products are decidedly incapable of providing accurate and reliable measurements,[3] which is not conspicuously disclosed at the point of sale. Worse, the Northwestern Study shows that the Products produce particularly inaccurate readings for users with normal to large arm circumference, which Defendants knew, in part because they tested the Products before bringing it to market and received hundreds of poor reviews.

    4.    The significant discrepancies between the readings generated by the Products and accurate readings are dangerous. Elevated readings may cause a user to believe that they have hypertension or are in a "hypertensive crisis" requiring emergency care.[4]

| BLOOD PRESSURE CATEGORY | SYSTOLIC mm Hg (upper number) | and/or | DIASTOLIC mm Hg (lower number) |
|---|---|---|---|
| NORMAL | LESS THAN 120 | and | LESS THAN 80 |
| ELEVATED | 120 – 129 | and | LESS THAN 80 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 1 | 130 – 139 | or | 80 – 89 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 2 | 140 OR HIGHER | or | 90 OR HIGHER |
| HYPERTENSIVE CRISIS (consult your doctor immediately) | HIGHER THAN 180 | and/or | HIGHER THAN 120 |

    5.    Defendants' misleading representations and omissions about the Products concern their central functionality, as the Products are effectively rendered useless and unreliable. Defendants' misleading representations and omissions also pose an

---

[3] A 6.41mmg standard deviation means that at least 31.8% of users consistently experience blood pressure readings that are only accurate by +/- 11.51 mmHg.

[4] https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.

unreasonable safety hazard as users may incorrectly believe their blood pressure is far higher or lower than it actually is, and rely on these readings in making future decisions about their healthcare and treatment (or foregoing treatment).

6.     Defendants have not recalled the Products or offered any other program to reimburse users.

7.     As a result of Defendants' misrepresentations and omissions, and the defective nature of the Products, Plaintiffs and putative Class members have suffered injury in fact.

8.     Plaintiffs bring this suit to halt Defendants' unlawful sales and marketing of the Products and for economic damages sustained as a result. Given the large quantities of the Products sold, this class action is the proper vehicle.

## II.   PARTIES

9.     Plaintiff Eric Doyle is and was at all times relevant to this Complaint domiciled in and a resident of the State of California.

10.     Plaintiff Gabriel Contreras is and was at all times relevant to this Complaint domiciled in and a resident of the State of California.

11.     Defendant HoMedics is a Michigan limited liability company with its principal place of business in Michigan.  On information and belief, HoMedics' members are all citizens and residents of Michigan.  HoMedics is a manufacturer and seller of various medical products and devices, including the Products. HoMedics designed and manufactured the Products for sale at Walmart. On information and belief, HoMedics also designed and approved the label statements and advertised specifications at issue in this case.

12.     Defendant Walmart is a Delaware corporation. Walmart is a publicly-traded national retailer of consumer goods, including the Products.

## III.   JURISDICTION AND VENUE

13.     This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are

at least 100 class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one putative class member and one Defendant are citizens of different states.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.  As set forth herein, HoMedics manufactured, designed, and approved the product and its labeling, and sold the Products to consumers in California through Walmart, including Plaintiffs.

15.     Further, as set forth herein, each Defendant has contacts in this district sufficient to subject it to the personal jurisdiction of this district as if this district were a separate state. Each Defendant continuously and systematically places goods into the stream of commerce for distribution in California, offers to ship products to California, and allows customers in California to purchase products.  Exercising jurisdiction over each Defendant is fair, just, and reasonable considering the quality and nature of each Defendant's acts that occur in California and which affect interests located in California. Each Defendant has purposefully availed itself of the privilege of conducting activities in California, and should reasonably anticipate being haled into court in California.

## IV.   GENERAL ALLEGATIONS

### A.   Background Regarding Blood Pressure Monitors

16.     Taking a blood pressure reading when visiting a primary care physician is standard practice.   Blood pressure is measured in a clinical setting using a sphygmomanometer.

17.     Capitalizing on the consuming public's interest in flexibility and convenience, at-home blood pressure monitors are becoming increasingly popular.

18.     Accurate blood pressure measurement is critically important for proper diagnosis and treatment. When diagnosing and treating hypertension, inaccurate blood pressure measurement values can result in "over diagnoses or underdiagnoses as well as

overtreatment or under treatment."[5] Inaccurate blood pressure measurements leading to untreated hypertension can cause other severe and deadly health conditions like kidney disease, heart disease, and stroke.

19.    Hypertension can cause serious damage to the heart. Excessive pressure can harden arteries, decreasing the flow of blood and oxygen to the heart. This elevated pressure and reduced blood flow can cause chest pain; heart attack (which occurs when the blood supply to the heart is blocked and heart muscle cells die from lack of oxygen, and the longer the blood flow is blocked, the greater the damage to the heart); heart failure (which occurs when the heart cannot pump enough blood and oxygen to other vital body organs); and irregular heart beat which can lead to a sudden death.

20.    An estimated 1.28 billion adults aged 30–79 years worldwide have hypertension and an estimated 46% of adults with hypertension are unaware that they have the condition.  According to the U.S. Center for Disease Control (CDC), in 2021, hypertension was a primary or contributing cause of 691,095 deaths in the United States, and nearly half of all adults in the United States (48.1%, 119.9 million) have hypertension—defined as a systolic blood pressure greater than *130 mmHg*, or a diastolic blood pressure greater than *80 mmHg*.[6]

21.    Because many consumers rely at least in part on home measurements to guide treatment, such inaccuracies could end with some people taking too much or too little blood pressure medication, seeking unnecessary treatment, or forgoing necessary treatment.[7]

22.    Accordingly, it is essential that blood pressure devices provide accurate and reliable measurements.

**B.    Defendants' Labeling and Marketing of the Products**

---

[5] Northwestern Study at 134.
[6]     https://www.cdc.gov/bloodpressure/facts.htm.
[7]     https://www.health.harvard.edu/blog/home-blood-pressure-monitors-arent-accurate-201410297494.

23.     The Products' features and attributes are described on the outer labeling. Specifically: (1) "Take ***accurate*** blood pressure and pulse readings with simple one-touch operation"; (2) "***Clinically Validated*** for ***Accuracy***"; (3) "Wide-range cuff, made with soft nylon fabrics for a comfortable fit while still providing ***accurate blood pressure measurements***"; and (4) "Compares ***readings*** to ***defined levels*** established by the U.S. American Heart Association (AHA) 2017 standard".

24.     The labeling for the Products is substantially similar across all models. The challenged label statements appear on the packaging for all Products. Exemplar images of the Products' labeling are shown below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT



**C.    Purchasers are Misled about the Products**

25.    Defendant HoMedics, as the manufacturer, is responsible for creating, designing, and approving the representations shown on the Products' packaging. These representations were placed on labeling at Defendant Walmart's direction and with Walmart's approval.  This includes the Products' description, features, and benefits.

26.     While Defendants tout the Products as "accurate" and "validated" for clinical accuracy by unexplained standards, these representations are false, or at minimum misleading, because the Products do not in fact produce "accurate" blood pressure readings, let alone consistently for all users.

27.     **First**, the outer packaging does not disclose that, according to Defendants, the Products are at best "accurate" within a range of +/- 3 mmHg for systolic and diastolic pressure.  The manual enclosed within the box specifically states the Products' "accuracy" is only "+/- 3 mmHg." This specification is buried in tiny font at the end of a 50-page pamphlet.

28.     The manual also concedes that the Product "may have difficulty determining the proper blood pressure for pregnant women and for users with irregular heartbeat, diabetes, poor circulation of blood, kidney problems or for users who have suffered from a stroke."

29.     However, based on Defendants' label statements, a reasonable purchaser of the Products would believe that the Products are actually accurate and that the blood pressure value displayed by the Products is in fact the user's actual blood pressure. A Product is "accurate" if it produces correct results every time it is properly used for all users.

30.     **Second**, the blood pressure measurements generated by the Products are in fact regularly inaccurate by 20 mmHg, 30 mmHg, and more.  The examples are many—at least 50 such reviews.  Users have compared the blood pressure readings generated by the Product against concurrent blood pressure readings generated at a physician's office to confirm the significant inaccuracies.

31.     Representative negative reviews posted to Walmart.com for the 8000 series model are shown below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

★☆☆☆☆  **Verified Purchase** ⓘ                    12/20/2021

**Avoid this inaccurate meter!**

I like that it tells you the readings. I like that it
connects to an app that allows me to send readings
to my doctors. What I don't like is that it is the most
inaccurate meter I have ever seen! It's often way too
high. We did a comparison in the office. The meter
told us 86/153. The manual reading was 68/106.
Quite the difference! It's too late to return it, so I
will have to see if I can find something else.

Ava

👍 0     👎 0

★☆☆☆☆  **Verified Purchase** ⓘ                    11/17/2020

It doesn't read the blood pressure correctly! It read
my husbands at over 200 and we got scared and
called to Doc. and they had us come in and get it
checked and theirs read a lot different! I brought the
machine in and they had me try it on my husband
and it had gone down but still over 25 more then the
hospitals! I need to return it and get something else!

Sharon

👍 5     👎 1

CLASS ACTION COMPLAINT

★☆☆☆☆   **Verified Purchase** ⓘ                    10/25/2020

**2 readings NOT good!**

My cardiologist says that taking three readings in a
row is NOT good. She says the average becomes
higher than it really is. Compared to the reading she
took, mine, in her office was a LOT higher. She told
me not to use it. I'm hoping to return it.

Richard

👍 6      👎 0

★☆☆☆☆                                             3/7/2021

**Not accurate**

I have good blood pressure at the drs just got this
due to my mother bugging me to just watch it. This
thing is telling me I'm in stage 2 and giving high
numbers but the doctors office causes me anxiety
so I have a panic attack every time I go in and my
blood pressure is still good. Don't waste ur money on
the more expensive one it's not worth it

Savannah

👍 4      👎 1

★☆☆☆☆   **Verified Purchase** ⓘ                    12/17/2021

**Not accurate**

I've talen my pressure 3 times. By the readings I'm
getting I should have had a massive stroke. I'm going
to try once more this evening. If I'm still at 180/100
I'm returning it.

Learningcurve

👍 0      👎 0

★☆☆☆☆                                             4/16/2019

**not very accurate at all**

my husband was recently diagnosed with high blood
pressure and has been using monitors to keep up
with his BP numbers so i thought that this would be
great to use since it is digital and easy to read. the
systolic readings on this were much much higher
than the ones he had gotten that his doctor
recommended! his heart rate was also off. if
someone is not been experienced in how to
read/process the info it could lead to not knowing
when there actually is a problem and that is a big
concern!

PrincessInMs    Incentivized Review    ⓘ

👍 2      👎 0

★☆☆☆☆   **Verified Purchase** ⓘ                    9/10/2020

**Reads 30 points high.**

Compared readingat the same time to 2 of my
doctors office readings. The Equate read 30 points
high. Returning!!!!!!

Phillip

👍 4      👎 0

★☆☆☆☆                                    4/21/2023

**Don't waste your money**

This machine was off about 30 points. It made me
have high blood pressure with its inaccurate reading.
Bought for my husband. After his doc appointment
we bought, it said it was stage 2 hypertension, so I
tried it (I have normal BP), and it said same to me.
Returning asap. Just bought today. Don't waste your
money.

Marie

👍 3      👎 0

★☆☆☆☆  **Verified Purchase** ⓘ        12/7/2020

**Not always accurate readings**

Does not work properly. one time is a good reading,
then a minute later a totally different reading.

11162014Widowed

👍 1      👎 0

★☆☆☆☆                                    8/6/2019

**Disappointed**

I had 2 of the 8000 BP units in 2 days. The first one I
received in the mail. It did not work at all, either with
use of batteries or the electrical adapter supplied.
Nada! I took it back to Walmart and they gladly gave
me my money back, on a store credit card. I then
bought another one off of the shelf in the pharmacy
that same day. After 2 consecutive days of readings,
my readings were higher then expected. The unit
told me I was stage 2 hypertensive. That is not what I
wanted to hear, nor is it the case. I called my
doctor's office, they asked me to bring the 8000
unit to there office and have it checked with a cuff
reading. The reading with the 8000 unit was higher.
It has continued to be higher and tell me I am stage
2. Conseq...

<u>See more</u>
Frustrated

👍 0      👎 0

★☆☆☆☆                                    1/22/2020

**Consistently 10-15 points too high.**

Not accurate. I took 7 readings at different times,
ensuring I was following the directions and
positioning and they were all 10 to 15 points higher
then they should have been. I compared it at my
doctor's office and it was the same, significantly
higher then my true BP. I will be returning this.

Emajade

👍 4      👎 0

CLASS ACTION COMPLAINT

32.     Similarly representative negative reviews published to Walmart.com for the 4000 series model are shown below.

★☆☆☆☆                                3/12/2021

**Equate BP monitor**

I'm a Certified Medical Assistant and I check manual blood pressure on the patients at my office all day. I checked this against manual blood pressure with another Certified Medical Assistant in my office, and it's very inaccurate. Reads very high.

Nicole

👍 2      👎 0

★☆☆☆☆                                11/7/2022

**Inaccurate Readings**

I had inaccurate readings on a previously purchased wrist BP monitor, and was advised to go with an arm. In order to ensure accuracy, I brought it to my MD's office to compare it's readings with the BP machine at their office. Accurate with systolic reading but 20 points difference on diastolic. Also getting 3 different readings (both numbers) across span of 5 minutes. Taking it back today as another Walmart item failure!

Karen

👍 5      👎 0

★☆☆☆☆                                9/14/2022

**Horrible inaccurate readings**

It's extremely dangerous selling such an inaccurate product that people must rely on for their health. I went to the doctors and they told me my blood pressure was 130/80 which is pretty much normal. When using this product it reads 180/120 absurdly high. When you test multiple times it always gives various readings that are extremely high. As someone who takes blood pressure medication it's important to know that these readings are accurate. This is a horrible product would not recommend.

Jason

👍 2      👎 0

★☆☆☆☆                                10/20/2020

**Way off of on the systolic pressure**

I just came back from my doctor. I went there because my meter has been running suspiciously high. Readings like 165/80 and 180/82. Today, just before going in to the doctor's office the meter showed 162/81. Doctor took my blood pressure and it was 132/80. Both pulses were 66. Don't waste your money on this machine.

Andrew

👍 0      👎 0

★☆☆☆☆                                9/9/2021

**Way off!!!!**

Inaccurate readings! This said 180/101 and my doctor's office said 144/88 within minutes of each other. She asked me if I was able to calibrate this and I don't see how. Plan to return this.

Penny

👍 0      👎 0

★☆☆☆☆                                3/12/2022

**Don't trust this unit, It caused me MUCH...**

Are you kidding???? I am getting consistent readings of 170 over 86. After being at rest for over an hour. All day long. The irregular heartbeat is active all the time. Soak and wet I am 146 lbs. Height 5.9 inches. I NEVER had readings this high.... NEVER! Don't save $$$ with this piece of junk. Trust your ticker to a better unit. Your Heart depends on it!

Teresa

👍 0      👎 0

33.     Indeed, according to the Northwestern Study, the Products were only accurate within a range of +/- ***2.5 mmHg*** on *average* (***8.0 mmHg*** standard deviation) for systolic blood pressure, and within ***5.1 mmHg*** on *average* (***6.4 mmHG*** standard deviation) for diastolic blood pressure. In other words, because these are averages, most if not all users experience incorrect readings; and because the standard deviations are so high, users experience wildly inaccurate readings rendering the Products useless.

34.     **Third**, the Northwestern Study concluded that the Products ***failed*** the ISO 81060-2:2018/AMD 1:2020 validation standard.   Thus, the Products are not truly "clinically validated" as represented on labeling.

35.     **Fourth**, the Northwestern Study found that the Products produce particularly inaccurate readings for users with a normal to large arm circumference.[8] The below scatterplots from the Northwestern Study compare blood pressure readings from the Products against blood pressure readings for the same individual taken by a physician with standard mercury sphygmomanometers that were calibrated before the study began and validated against measurements generated by a dual head teaching stethoscope. As shown in the images, the larger the arm circumference, the greater the deviation from accurate readings.   Individuals with an arm circumference of 30 cm or more are given completely unreliable readings that regularly deviate 10 mmHg or more from their actual blood pressure.



---

[8] On average, men have a bicep size of 14.6 inches (37.1 cm), while women have an average bicep size of 13.4 inches (34.0 cm). *See* https://www.bodybuildingmealplan.com/average-bicep-size/.

36.     Against this backdrop, the Products' labeling is false and misleading. Reasonable consumers would understand statements like (1) "Take **accurate** blood pressure and pulse readings with simple one-touch operation", (2) "**Clinically Validated** for **Accuracy**", (3) "Wide-range cuff, made with soft nylon fabrics for a comfortable fit while still providing **accurate blood pressure measurements**", and (4) "Compares **readings** to **defined levels** established by the U.S. American Heart Association (AHA) 2017 standard" (rear panel), as representing that the Products will provide accurate blood pressure measurements with each use, and that the resulting measurement shown on the screen is the consumers' actual blood pressure.

37.     Faced with the above statements, a reasonable consumer would not expect that the Products would provide inaccurate readings under normal use for most if not all users, and are particularly inaccurate for users with a normal to large arm circumference. Nor would a reasonable consumer expect that the Products failed a clinical validation test and, according to Defendants, are not suitable for "pregnant women and for users with irregular heartbeat, diabetes, poor circulation of blood, kidney problems or for users who have suffered from a stroke."

38.     None of the above limitations were disclosed by Defendants to consumers at the point of purchase. By touting these positive attributes that concern the central functionality of the Products, Defendants were obligated to disclose the Products' related limitations.

**D.    Defendants Knew About the Products' Defect and Limitations**

39.     Defendants have been aware of the Products' inaccurate readings and the above-described limitations since the Products were launched (on information and belief, October 2018), and months earlier.

40.     As explained above, no less than fifty consumers submitted thorough and detailed reviews about the Products' consistently inaccurate readings. The volume of negative reviews raising the exact same defect is unusually large and is indicative of a widespread problem.

41. Not only does the number of complaints over the course of several years demonstrate that Defendants were on notice of the defective readings, but the substance of the complaints shows that consumers were surprised, frustrated, and disappointed with the inaccurate readings generated by the Products and would not have purchased the Products had the defect been disclosed.

42. Defendants would have seen the above-described negative reviews and complaints, specifically on Walmart's own website. Online Reputation Management (ORM) is now a standard business practice among major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. ORM involves the monitoring of the reputation of an individual or a brand on the internet, addressing content, which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation. Many companies offer ORM consulting services for businesses.

43. Like most companies, Defendants care about their reputation and regularly monitor online customer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics. One and two-star reviews like those displayed above would be particularly attention-grabbing for Defendants' management because extreme reviews are often the result of material problems. As such, Defendants' management knew about the above-referenced consumer complaints shortly after each complaint was posted on Walmart's website.

44. Additionally, Defendants collectively are experienced in designing and manufacturing medical products. As experienced manufacturers, Defendants conduct pre-sale and post-sale safety testing to verify the accuracy of blood pressure readings. Defendants discovered the consistently inaccurate readings during testing both before and after publicly releasing the Products for sale, but made a business decision not to take action, including recalling the Products or changing labeling. Far from it, Defendants continue to advertise the Products as "accurate" and "clinically validated for accuracy."

45.     Finally, Defendants also would have had notice of the defective readings as a result of warranty claims. Before accepting a return or performing a repair, Defendants' policy is to ask each customer for a description of the request and to keep track of the reasons given. Descriptions provided with returns and/or repair requests of the Products therefore would have disclosed the defective readings

## E.     Defendants' Duty to Disclose

46.     <u>Superior Knowledge</u>: As described above, Defendants are experienced in the design and manufacture of medical products such as the Products. As experienced manufacturers, Defendants conduct tests, including pre-sale testing, to verify the specifications of the products sold. Defendants also receive, monitor, and aggregate consumer complaints.  A reasonable consumer would not be on notice of the Products' inability to generate consistently accurate readings and do not have access to the granular data in Defendants' possession.

47.     <u>Active Concealment</u>: Defendants actively concealed the Products' shortcomings as described above. On information and belief, in response to consumer complaints within the warranty period regarding the Products' inaccurate readings, Defendants refused to repair the Products, told consumers they were accurate and working as designed, and/or replaced the defective Products with the same defective Products to make consumers believe the Products were always working and the problem lies with the consumer.  On information and belief, Defendants also view and respond to negative reviews about the Products' inaccurate readings without acknowledging the defect or the Products' limitations, and instead continue to tout the Products as accurate.

48.     <u>Partial Representations</u>: As described above, Defendants represent on the packaging that each Product functions as an "accurate" and capable blood pressure monitor.  Yet Defendants fail to disclose that the readings generated by each Product are not consistently accurate because they are at best within a range of accuracy. Each Product is incapable of providing accurate readings for users with a normal or large arm circumference, and the Products have failed a clinical validation test. By disclosing some

1  beneficial attributes about the Products and describing their performance, Defendant is
2  obligated to disclose material limitations that negatively affect the use of the Products.

3      49.    The defective performance affects the central functionality of the Products in
4  that it renders the Products unusable. For the same reasons, the Products present an
5  unreasonable safety hazard because users rely on home blood pressure devices to manage
6  their healthcare and make medical decisions.

7      50.    Defendants could have and should have prominently disclosed the limitations
8  and omitted facts on packaging or at the point of sale—all prior to purchase.  Had
9  Defendants disclosed the defect in this manner, consumers would have been aware of it.

10     **F.     Plaintiffs' Purchases**

11  *Plaintiff Doyle*

12     51.    Plaintiff Doyle purchased an Equate 4000 series blood pressure monitor in or
13  about October or November 2023 from a Walmart store in Duarte, California.

14     52.    Before purchasing the Product, Plaintiff Doyle viewed the label statements
15  challenged in this action and described above.

16     53.    As a reasonable consumer, he believed that information regarding critical
17  performance limitations and safety issues, like the Product's inability to generate
18  consistently accurate blood pressure readings, and the readings generated are not the user's
19  actual blood pressure (but are only an estimate within a wide range of accuracy), would
20  have been prominently disclosed by the manufacturer at the point of sale.  Because no
21  such limitations were disclosed, let alone prominently, he understood the label statements
22  made by Defendants as promising that the Product would produce consistently accurate
23  blood pressure readings for all users and was safe under ordinary use. Plaintiff Doyle
24  relied on Defendants' misrepresentations and omissions in purchasing the Product.

25     54.    Had Plaintiff Doyle known or otherwise been made aware of the Product's
26  limitations, he would not have purchased it or would have paid significantly less for it. At
27  a minimum, Plaintiff Doyle paid a price premium for the Product based on Defendants'
28  misrepresentations and omissions described herein.

55.     Plaintiff Doyle would purchase another substantially similar product manufactured by Defendants in the future if the product was redesigned to make it 100% accurate. Plaintiff Doyle, however, faces an imminent threat of harm because he will not be able to rely on any representations or omissions of performance in the future and, thus, will not be able to purchase a device manufactured by Defendants.

***Plaintiff Contreras***

56.     Plaintiff Contreras purchased an Equate 8000 series blood pressure monitor in or about May 2023 from a Walmart store in Lancaster, California.

57.     Before purchasing the Product, Plaintiff Contreras viewed the label statements challenged in this action and described above.

58.     As a reasonable consumer, he believed that information regarding critical performance limitations and safety issues, like the Product's inability to generate consistently accurate blood pressure readings, and the readings generated are not the user's actual blood pressure (but are only an estimate within a wide range of accuracy), would have been prominently disclosed by the manufacturer at the point of sale.  Because no such limitations were disclosed, let alone prominently, he understood the label statements made by Defendants as promising that the Product would produce consistently accurate blood pressure readings for all users and was safe under ordinary use. Plaintiff Contreras relied on Defendants' misrepresentations and omissions in purchasing the Product.

59.     Had Plaintiff Contreras known or otherwise been made aware of the Product's limitations, he would not have purchased it or would have paid significantly less for it. At a minimum, Plaintiff Contreras paid a price premium for the Product based on Defendants' misrepresentations and omissions described herein.

60.     Plaintiff Contreras would purchase another substantially similar product manufactured by Defendants in the future if the product was redesigned to make it 100% accurate. Plaintiff Contreras, however, faces an imminent threat of harm because he will not be able to rely on any representations or omissions of performance in the future and, thus, will not be able to purchase a device manufactured by Defendants.

## V.     TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

61.     Any applicable statutes of limitation have been tolled by the discovery doctrine and Defendants' knowing and active concealment of the defect.

62.     Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the defect and could not reasonably discover the defect or Defendants' deception with respect to the defect.

63.     Prior to purchasing and using the Products, Plaintiffs and Class members had no reasonable way of knowing about the Products' omitted limitations.  Further, Plaintiffs and members of the Class did not discover and did not know facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

64.     By failing to provide immediate and conspicuous notice of the Products' limitations and inabilities, by responding and/or refusing to respond to negative reviews about the Product's performance without publicly acknowledging the Products' limitations, and by replacing Products under warranty with the same defective Products, Defendant actively concealed the Products' limitations from Plaintiff and Class members.

65.     Plaintiffs did not learn about the Products' inability to generate accurate readings and the Products' limitations described herein until shortly before commencement of this action, or at minimum until they each purchased and used the Products.

66.     Upon information and belief, Defendants intended their acts to conceal the facts and claims from Plaintiffs and Class members. Plaintiffs and Class members were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct.

67.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' active concealment

## VI.    CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action on behalf of themselves and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seek certification of the following class:

**<u>California Class:</u>**
All persons in California who purchased one or more Products from a Walmart brick-and-mortar store during the Class Period other than for resale.

69.     The California Class is referred to as the "Class." Excluded from the Class are the Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest. Also excluded from the Class are persons or entities that purchased products from Defendants for purposes of resale.

70.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues, and ending on the date of entry of judgment.

71.     Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

72.     **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiffs allege that there are in excess of 100,000 members of the Class.

73.   **Typicality.** Plaintiffs' claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendants' course of conduct as described herein.

74.   **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs have retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiffs and their counsel intend to diligently prosecute this action.

75.   **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

a.   Whether the Products contain the defect and performance limitations alleged herein;

b.   Whether Defendants failed to appropriately warn Class members of the damage that could result from the use of the Products;

c.   Whether the Defendants breached express and/or implied warranties made for the benefit of Plaintiffs and the Class;

d.   Whether Defendants had actual or imputed knowledge of the defect and performance limitations but did not disclose it to Plaintiffs and the Class;

e.   Whether Defendants promoted the Products with misleading statements of fact and material omissions;

f.   Whether Defendants' marketing, advertising, packaging, labeling, and/or other promotional materials for the Products are deceptive, unfair, or misleading;

g.   Whether Defendants' actions and omissions violate state law;

h.   Whether Defendants' conduct violates public policy;

i.   Whether Plaintiffs and putative members of the Class have suffered an ascertainable loss of monies or property or other value as a result of Defendants' acts and omissions of material facts;

j.   Whether Defendants were unjustly enriched at the expense of Plaintiffs and members of the putative Class in connection with selling the Products;

k.   Whether Plaintiffs and members of the putative Class are entitled to monetary damages and, if so, the nature of such relief; and

l.   Whether Plaintiffs and members of the putative Class are entitled to equitable or injunctive relief and, if so, the nature of such relief.

76.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

77.   The products at issue in the action are substantially similar in all material respects.  Namely, the products are all upper-arm blood pressure monitors with the same

label statements and the same underlying blood pressure measurement technology. As is relevant to this case, the products are materially indistinguishable.

## VII.   INADEQUACY OF LEGAL REMEDIES

78.   In the alternative to those claims seeking remedies at law, Plaintiffs and Class members allege that no plain, adequate, and complete remedy exists at law to address Defendants' fraudulent, unlawful, and unfair business practices. The legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief, including because their equitable claims will tried to the Court instead of a jury. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

79.   Additionally, unlike damages, the Court's discretion in fashioning equitable relief is very broad and can be awarded when the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177-180 (2000) (restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred.").

80.   Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007) (noting that restitution is available even when damages are unavailable).

81.   Furthermore, the standard and necessary elements for a violation of the UCL "unfair" prong and for quasi-contract/unjust enrichment are different from the standard that governs a legal claim.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of the California Class)

82.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though set forth fully herein.

83.     Plaintiffs' claims are brought under Cal. Commercial Code § 2314.

84.     Defendants manufactured and distributed Products for sale to Plaintiffs and the Class members.

85.     Defendants impliedly warranted to Plaintiffs and Class members that the Products were free of defects and were merchantable and fit for their ordinary purpose for which such goods are used.

86.     As alleged herein, Defendants breached the implied warranty of merchantability because the Products suffer from a central and material defect in that they are incapable of producing consistently accurate blood pressure readings for all users.  The Products are, therefore, defective, unmerchantable, and unfit for its ordinary, intended purpose.

87.     Plaintiffs further allege that the Products are not merchantable because at the time of sale and all times thereafter:

   a. The Products as advertised would not pass without objection in the medical device trade given the defect and failed clinical validation testing;

   b. The defect renders each Product unsafe and unfit for its ordinary purpose;

   c. The Products were inadequately labeled as accurate, clinically validated, and capable of producing correct blood pressure readings, and the labeling failed to disclose the Products' limitations described herein; and

   d. The Products do not conform to its labeling, which represents that it is accurate, clinically validated, safe, and suitable for its intended use.

88.     Due to the defective blood pressure measurements, Plaintiffs and the Class members cannot operate their Products as intended, substantially free from defects.  The Products do not provide accurate and reliable blood pressure readings which poses a serious safety risk as users rely on the Products for medical treatment and management. As a result, Plaintiffs and members of the Class cannot use their Products for the purposes for which they purchased them.

89.     Privity of contract is not required here because Plaintiffs and Class members were each intended third-party beneficiaries of the Products sold through retailers. The retailer here, Walmart, was not intended to be the ultimate consumer of the Products and has no rights under the implied warranty provided with the Products.  Plaintiffs and Class members are intended third-party beneficiaries of contracts between Walmart and HoMedics, specifically the intended beneficiaries of each Defendants' implied warranties.

90.     In any event, privity of contract is satisfied because Plaintiffs and the Class purchased the Products directly from Walmart, and Walmart owns the Equate brand.

91.     Plaintiffs did not receive or otherwise have the opportunity to review, at or before the time of sale, any purported warranty exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class members have been injured in an amount to be proven at trial.

92.     Plaintiffs and the Class members timely provided Defendants notice of the issues raised in this count and Complaint, and an opportunity to cure, by letters dated December 4, 2023 and December 15, 2023. No response was given.  Alternatively, Plaintiffs and Class members were excused from providing Defendants with notice and an opportunity to cure because it would have been futile.  As described above, Defendants knew about the defective and misrepresented nature of the Products for years.

## COUNT II
### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT - BREACH OF IMPLIED WARRANTY
### Cal. Civ. Code §§ 1791.1 & 1792
### (On Behalf of the California Class)

93.   Plaintiffs re-alleges and incorporate by reference the preceding allegations as though set forth fully herein.

94.   Plaintiffs and the other Class members who purchased the Products in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

95.   The Products are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

96.   Each Defendant is a "manufacturer" of the Products within the meaning of Cal. Civ. Code § 1791(j).

97.   Each Defendant impliedly warranted to Plaintiffs and the other Class Members that the Products were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1 & 1792.

98.   However, the Products do not have the quality that a reasonable purchaser would expect.

99.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: "(1) pass without objection in the trade under the contract description; (2) are fit for the ordinary purposes for which such goods are used; … and (4) conform to the promises or affirmations of fact made on the container or label."

100.   The Products would not pass without objection in the trade because they are incapable of providing consistently accurate and reliable blood pressure readings, particularly for users with a normal or large arm circumference, and none of this information is conspicuously disclosed at the point of sale. Additionally, according to the

Northwestern Study, the Products failed clinical validation testing and did not pass the ISO 81060-2:2018/AMD 1:2020 validation standard.

101.   The Products are not fit for the ordinary purpose they are used because of the inaccurate blood pressure readings and defect as alleged herein.

102.   The Products do not conform to their labeling which, as explained above, represent that the Products are accurate, clinically validated, safe, and suitable for their intended use as home blood pressure monitors.

103.   The defect in the Products is latent.  Though the Products appear operable when new, the defect existed at the time of sale and throughout the one-year period under the Song-Beverly Act.  Accordingly, any subsequent discovery of the defect by Class members beyond that time does not bar an implied warranty claim under the Song-Beverly Act.

104.   Further, despite due diligence, Plaintiffs and Class Members could not have discovered the defect before the manifestation of its symptoms in the form of wildly inaccurate readings.  Those Class members whose claims would have otherwise expired allege that the discovery rule and doctrine of fraudulent concealment tolls them.

105.   Each Defendant breached the implied warranty of merchantability by manufacturing and selling Products containing the defect. The existence of the defect has caused Plaintiff and the other Class members not to receive the benefit of their bargain and have caused Products to depreciate in value.

106.   As a direct and proximate result of each Defendant's breach of the implied warranty of merchantability, Plaintiffs and the other Class members received goods whose defective condition substantially impairs their value to Plaintiffs and the other Class members. Plaintiffs and the other Class members have been damaged as a result of the diminished value of the Products.

107.   Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Products or the overpayment or diminution in value of their Products.

108.   Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## COUNT III
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 et seq. ("UCL")
### (On Behalf of the California Class)

109.   Plaintiffs re-allege and incorporate by reference the preceding allegations as though set forth fully herein.

110.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

111.   Defendants' acts and omissions as alleged herein constitute business acts and practices.

112.   Unlawful: The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

   a.   The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.;

   b.   Implied warranty of merchantability under the Commercial Code and Song-Beverly Act.

113.   Unfair: Defendants' conduct concerning the labeling, advertising, and sale of the Products was "unfair" because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims. Distributing materially inaccurate and therefore unsafe blood pressure monitors has no public utility at all.

114.   Any countervailing benefits to consumers or competition did not outweigh this injury. Selling products unsafe and unfit for their intended purposes only injures healthy competition and harms consumers. Defendants also minimize the scope of the defect despite knowing the Products are unreasonably dangerous, made repairs and/or replacements during the warranty period that unbeknownst to consumers did not provide

CLASS ACTION COMPLAINT

a permanent fix, and knowingly sold defective products in hopes of forcing consumers to purchase replacement products.

115.   Defendants' conduct concerning the labeling, advertising, and sale of the Products was and is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including but not limited to the applicable sections of the Consumers Legal Remedies Act and the Song-Beverly Consumer Warranty Act.

116.   Fraudulent: A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

117.   As set forth herein, Defendants engaged in deceptive acts by knowingly omitting from Plaintiffs and Class members the Products' performance limitations, which is a material safety defect, including the Products' inability to generate consistently accurate readings, the reading shown on the Products is not the user's actual blood pressure but is only accurate within an undisclosed wide range, the Products are useless for persons with a normal to large arm circumference, the Products are not suitable for pregnant women and for users with irregular heartbeat, diabetes, poor circulation of blood, kidney problems or for users who have suffered from a stroke, and the Products failed a validation test. Defendants knew that the Products were defectively designed, posed an unreasonable safety risk, and unsuitable for their intended use.

118.   Each Defendant was under a duty to Plaintiffs and the Class members to disclose the defective nature of the Products because:

a.   Defendants were in a superior position to know the true state of facts about the defect and the Products' limitations;

b.   Plaintiffs and the Class members could not reasonably have been expected to learn or discover that the Products had a safety defect and were incapable of generating accurate blood pressure readings for all users before purchase;

c. Defendants knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the defect and performance limitations;

d. Defendants made partial representations regarding conceptually related attributes and benefits of the Products on advertising/labeling at the point of sale while deceptively omitting the existence of the defect and performance limitations; and

e. Defendants actively concealed the defect in part because, in response to consumer complaints within the warranty period regarding the Products' inaccurate readings, Defendants refused to repair the Product, told consumers it was accurate and working as designed, or replaced the defective Products with the same defective Products to make consumers believe the Products were always working and the problem lies with the consumer. Defendants also view and/or respond to negative reviews about the Products' inaccurate readings without publicly acknowledging the defect or the Products' limitations, and instead continue to tout the Product as accurate on labeling.

119.   Defendants could have and should have prominently disclosed the reliability, safety, and performance limitations of the Products on labeling. Had Defendants disclosed the defect in this manner, Plaintiffs and reasonable consumers would have been aware of it.

120.   The facts concealed or not disclosed by Defendants to Plaintiffs and Class members are material in that a reasonable consumer would have considered them important in deciding whether to purchase Defendants' Products or pay a lesser price. Had Plaintiffs and the Class known about the defective nature of the Products, they would not have purchased them or paid less for them.

121.   Defendants misrepresented the Products as generating "accurate" blood pressure readings as described above.

122.   Defendants misrepresented the Products as being "clinically validated for accuracy" as described above.

123.   Defendants profited from selling the falsely, deceptively, and unlawfully advertised Products to unwary purchasers.

124.   Plaintiffs and Class Members will likely continue to be damaged by Defendants' deceptive trade practices because Defendants continue disseminating misleading information on the Products' packaging. Thus, injunctive relief enjoining Defendants' deceptive practices is proper.

125.   Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs have suffered injury in fact as a result of Defendants' unlawful conduct.

126.   Under Bus. & Prof. Code § 17203, Plaintiffs seek an order requiring that Defendants correct the misleading labeling and commence a corrective advertising campaign.

127.   Plaintiffs and the Class also seek an order for and restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

## COUNT IV
### VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code § 1750 et seq. ("CLRA")
### (On Behalf of the California Class)

128.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

129.   The CLRA prohibits deceptive practices concerning the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

130.   Defendants' misrepresentations and omissions were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes

by Plaintiffs and Class members, and violated and continue to violate the following sections of the CLRA:

    a. § 1770(a)(5): representing that goods have characteristics, uses, or benefits that they do not have;

    b. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

    c. § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

    d. § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

131. As set forth herein, Defendants engaged in deceptive acts by knowingly omitting from Plaintiffs and Class members the Products' performance limitations, which is a material safety defect, including the Products' inability to generate consistently accurate readings, the reading shown on the Products is not the user's actual blood pressure but is only accurate within an undisclosed wide range, the Products are useless for persons with a normal to large arm circumference, the Products are not suitable for pregnant women and for users with irregular heartbeat, diabetes, poor circulation of blood, kidney problems or for users who have suffered from a stroke, and the Products failed a validation test. Defendants knew that the Products were defectively designed, posed an unreasonable safety risk, and unsuitable for their intended use.

132. Defendants were under a duty to Plaintiffs and the Class members to disclose the defective nature of the Products because:

    a. Defendants were in a superior position to know the true state of facts about the defect and the Products' limitations;

    b. Plaintiffs and the Class members could not reasonably have been expected to learn or discover that the Products had a safety defect and were incapable of generating accurate blood pressure readings for all users before purchase;

    c.  Defendants knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the defect and performance limitations;

    d.  Defendants made partial representations regarding conceptually related attributes and benefits of the Products on advertising/labeling at the point of sale while deceptively omitting the existence of the defect and performance limitations; and

    e.  Defendants actively concealed the defect in part because, in response to consumer complaints within the warranty period regarding the Products' inaccurate readings, Defendants refused to repair the Product, told consumers it was accurate and working as designed, or replaced the defective Products with the same defective Products to make consumers believe the Products were always working and the problem lies with the consumer.  Defendants also view and/or respond to negative reviews about the Products' inaccurate readings without publicly acknowledging the defect or the Products' limitations, and instead continue to tout the Product as accurate on labeling.

133.  Defendants could have and should have prominently disclosed the reliability, safety, and performance limitations of the Products on labeling. Had Defendants disclosed the defect in this manner, Plaintiffs and reasonable consumers would have been aware of it.

134.  The facts concealed or not disclosed by Defendants to Plaintiffs and Class members are material in that a reasonable consumer would have considered them important in deciding whether to purchase Defendants' Products or pay a lesser price. Had Plaintiffs and the Class known about the defective nature of the Products, they would not have purchased them or paid less for them.

135.  Defendants misrepresented the Products as generating "accurate" blood pressure readings as described above.

136.   Defendants misrepresented the Products as being "clinically validated for accuracy" as described above.

137.   Defendants profited from selling the falsely, deceptively, and unlawfully advertised Products to unwary purchasers.

138.   Plaintiffs and Class Members will likely continue to be damaged by Defendants' deceptive trade practices because Defendants continue disseminating misleading information on the Products' packaging. Thus, injunctive relief enjoining Defendants' deceptive practices is proper.

139.   Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs have suffered injury in fact as a result of Defendants' unlawful conduct.

140.   On December 4, 2023 and December 15, 2023, CLRA demand letters were sent to Defendants pursuant to Cal. Civ. Code § 1782. This letter provided notice of Defendants' violation of the CLRA and demanded that Defendants correct the unlawful and deceptive practices alleged herein. Because the 30-day period has not yet expired, Plaintiffs only seek injunctive relief under this count. Upon expiration of the 30-day period without cure, Plaintiffs will amend this Complaint to seek all monetary relief available under the CLRA and California Civil Code § 1780, including including money damages and punitive damages.

141.   Plaintiffs also seek injunctive relief, reasonable attorney fees and costs, and any other relief the Court deems proper.

## COUNT V
### COMMON LAW FRAUD (MISREPRESENTATION AND CONCEALMENT)
### (On Behalf of the California Class)

142.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

143.   Plaintiffs plead this claim under California law.

144.  As set forth herein, Defendants engaged in deceptive acts by knowingly omitting from Plaintiffs and Class members the Products' performance limitations, which is a material safety defect, including the Products' inability to generate consistently accurate readings, the reading shown on the Products is not the user's actual blood pressure but is only accurate within an undisclosed wide range, the Products are useless for persons with a normal to large arm circumference, the Products are not suitable for pregnant women and for users with irregular heartbeat, diabetes, poor circulation of blood, kidney problems or for users who have suffered from a stroke, and the Products failed a validation test. Defendants knew that the Products were defectively designed, posed an unreasonable safety risk, and unsuitable for their intended use.

145.  Defendants were under a duty to Plaintiffs and the Class members to disclose the defective nature of the Products because:

a.  Defendants were in a superior position to know the true state of facts about the defect and the Products' limitations;

b.  Plaintiffs and the Class members could not reasonably have been expected to learn or discover that the Products had a safety defect and were incapable of generating accurate blood pressure readings for all users before purchase;

c.  Defendants knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the defect and performance limitations;

d.  Defendants made partial representations regarding conceptually related attributes and benefits of the Products on advertising/labeling at the point of sale while deceptively omitting the existence of the defect and performance limitations; and

e.  Defendants actively concealed the defect in part because, in response to consumer complaints within the warranty period regarding the Products' inaccurate readings, Defendants refused to repair the Product, told consumers it was accurate and working as designed, or replaced the defective Products

with the same defective Products to make consumers believe the Products were always working and the problem lies with the consumer. Defendants also view and/or respond to negative reviews about the Products' inaccurate readings without publicly acknowledging the defect or the Products' limitations, and instead continue to tout the Product as accurate on labeling.

146. Defendants could have and should have prominently disclosed the reliability, safety, and performance limitations of the Products on labeling. Had Defendants disclosed the defect in this manner, Plaintiffs and reasonable consumers would have been aware of it.

147. The facts concealed or not disclosed by Defendants to Plaintiffs and Class members are material in that a reasonable consumer would have considered them important in deciding whether to purchase Defendants' Products or pay a lesser price. Had Plaintiffs and the Class known about the defective nature of the Products, they would not have purchased them or paid less for them.

148. Defendants misrepresented the Products as generating "accurate" blood pressure readings as described above.

149. Defendants misrepresented the Products as being "clinically validated for accuracy" as described above.

150. Defendants profited from selling the falsely, deceptively, and unlawfully advertised Products to unwary purchasers.

151. Plaintiffs and Class Members will likely continue to be damaged by Defendants' deceptive trade practices because Defendants continue disseminating misleading information on the Products' packaging. Thus, injunctive relief enjoining Defendants' deceptive practices is proper.

152. Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs have suffered injury in fact as a result of Defendants' unlawful conduct.

153.   As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

154.   Plaintiffs and the class are also entitled to punitive or exemplary damages. Defendants, through their senior executives and officers, undertook the deceptive acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, malice, and/or oppression. Based on the allegations above, Defendants' actions constituted fraud because Defendants intended to and did deceive and injure Plaintiffs and the Class. Based on the allegations above, Defendants' actions constituted malice because Defendants acted with the intent to and did cause injury to Plaintiffs and the Class, and because Defendants' deceptive conduct was done with a willful and knowing disregard of the rights of Plaintiffs and the Class.

155.   Plaintiffs also seek injunctive relief, reasonable attorney fees and costs, and any other relief the Court deems proper.

## COUNT VI
### BREACH OF EXPRESS WARRANTY
### (On Behalf of the California Class)

156.   Plaintiffs re-allege and incorporate by reference the preceding allegations as though set forth fully herein.

157.   Defendants issued an express warranty on the Products' labeling that the Products would generate "accurate" blood pressure readings, and thus would not generate consistently inaccurate readings for any segment of users, let alone users with a normal arm circumference.

158.   Defendants issued an express warranty on the Products' labeling that the Products were "clinically validated for accuracy" and thus had not failed any validation testing.

159.   Defendants' affirmation of fact made to Plaintiffs and the Class became a part of the basis of the bargain between Defendants and Plaintiffs and Class members, thereby creating warranties that the Products would conform to Defendants' affirmations of fact.

160.   Defendants breached the express warranties because the generated blood pressure readings are not in fact accurate and the Products failed validation testing.

161.   Plaintiffs and the Class members timely provided Defendants notice of the issues raised in this count and Complaint, and an opportunity to cure, by letters dated December 4, 2023 and December 15, 2023. No response was given.  Alternatively, Plaintiffs and Class members were excused from providing Defendants with notice and an opportunity to cure because it would have been futile.  As described above, Defendants knew about the defective and misrepresented nature of the Products for years.

162.   Plaintiffs and the Class were injured as a direct and proximate result of Defendants' breach because they would not have purchased the Products if they had known the true facts, or would have paid less for the Products, and the Products did not have the quality, effectiveness, or value as promised.

163.   As a result, Plaintiffs and the Class have been damaged in the full amount of the purchase price of the Products, or at minimum a portion of the purchase price of the Products.

## COUNT VII
### Unjust Enrichment
### (On Behalf of the California Class)

164.   Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

165.   Plaintiffs and the Class plead this count in the alternative to the above counts. Plaintiffs and the Class allege, in the alternative, that their purchases were fraudulently induced and are voidable.

166.   Plaintiffs and putative Class members conferred a benefit on Defendants when they purchased the Products.

167.   Defendants knew or should have known that the payments rendered by Plaintiffs and the Class were given with the expectation that the Products would have the qualities, characteristics, and suitability for use represented and warranted by Defendants.

As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

168.   By the wrongful acts and omissions described herein, including selling the Products which contain the safety defect and performance limitations described in detail above and did not otherwise perform as represented and for the particular purpose for which they were intended, Defendants were unjustly enriched at the expense of Plaintiffs and putative Class members.

169.   Plaintiffs' detriment and Defendants' enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

170.   Defendants have profited from their unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and putative Class members when it would be unjust for Defendants to be permitted to retain the benefit.

171.   Plaintiffs and putative Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants.

172.   As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiffs and putative Class members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for following relief:

      a.   Certification of this case as a class action on behalf of the proposed Class and subclasses defined above, appointment of Plaintiffs as Class representatives, and appointment of their counsel as Class counsel;

      b.   An award to Plaintiffs and the proposed Class of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits Defendants obtained from Plaintiffs and the proposed Class as a

result of the unlawful, unfair and fraudulent business practices described herein;

c. An injunction ordering Defendants to cease the false advertising and unfair business practices complained of herein;

d. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct;

e. An award of nominal, punitive, and statutory damages where available;

f. Reasonable expenses and attorneys' fees;

g. Pre- and post-judgment interest, to the extent allowable; and

h. For such further relief that the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury for all claims so triable.

Dated:  December 27, 2023        MILBERG COLEMAN BRYSON PHILLIPS
                                GROSSMAN, PLLC


                                By: */s/ Alexander E. Wolf*
                                    ALEXANDER E. WOLF
                                    Attorneys for Plaintiffs